HERRON v. RAUPP.

1. STATUTE OF FRAUDS — CONTRACTS — ORAL CONTRACTS — PER-
FORMANCE—TIME.
An oral contract, the performance of which might be de-
manded, and the performance thereof possible, within a year,
is not within the statute of frauds, although in the contem-
plation of the parties a longer period might be taken.

2. CONTRACTS—BREACH—DAMAGES—LOSS OF PROFITS.
In an action for breach of a logging contract, in view of testi-
mony based on the cost of such work in an ordinary season,
and testimony that mill sites selected by the parties were the
only suitable ones, and the failure to so locate them was de-
fendant's refusal to do so, the loss of profits were not so con-
jectural and speculative as to prevent a recovery.

3. SAME.
Whether or not the contract declared upon was for an entire
tract of timber was properly submitted to the jury.

Error to Iosco; Connine, J. Submitted January 20,
1909. (Docket No. 30.) Decided March 30, 1909.

Assumpsit by William Herron against Gustav A.
Raupp, Matthias Raupp, Jr., and John Seavitt, copart-
ners as G. A. Raupp & Co., for breach of a logging con-
tract. There was judgment for plaintiff, and defendants
bring error. Affirmed.

*Ignatius J. Salliotte* (*Ward B. Connine* and *Charles
C. Stewart*, of counsel), for appellants.

*William T. Yeo*, for appellee.

BLAIR, C. J. Plaintiff brought this action to recover
the profits which he alleged he would have received if de-
fendants, a copartnership, had not prevented his perfor-
mance of an alleged contract with said firm to peel cer-
tain hemlock bark and log certain timber of defendants.

The declaration alleges that the parties entered into a verbal contract on the 16th of May, 1906, whereby the defendants agreed that—

"In order to manufacture such timber they would place or cause to be placed on said lands forthwith portable sawmills to be located at suitable mill sites on said lands as follows, to wit: One mill site to be located on said lands on section twelve, one to be located on said lands in section fourteen, one to be located on said lands in section twenty-three, and one to be located near the center of said lands on sections twenty-seven and twenty-eight, all in township twenty-five (25) North, in range four (4) East, in said county of Oscoda," etc., and that the plaintiff "was thereby induced to and did enter into a certain verbal contract whereby the said plaintiff then and there, in consideration of the payment of certain sums of money to be made by said defendants as herein stated, agreed to cut into sawlogs all the merchantable timber standing, lying and being on said lands, and to skid and haul all the said sawlogs sufficient to keep the sawmills to be placed on said lands forthwith as aforesaid in operation, said sawlogs to be delivered on skidways without being decked, at the nearest mill sites selected by the said plaintiff and defendants as aforesaid, at the rate of at least two million feet, log scale, each season and as much more as said defendants should at any time order said plaintiff to cut and deliver as aforesaid, to be scaled (by log scale) on skidways at mill sites by some competent scaler to be agreed upon between said plaintiff and defendants, and to peel all merchantable tan bark from the hemlock timber on said lands."

The testimony on behalf of plaintiff tended to show a contract with reference to peeling the bark and logging the timber. The testimony for defendants tended to show that the agreement related to the bark solely, and that they never made any agreement whatever with reference to logging the timber. Plaintiff testified that they selected two of the mill sites on the day they made the contract.

"One was to be in 14 where the mill is now, and there was to be another mill in section 23 and 24 and one in 11 and 12 and one in 27 and 28."

Defendants' superintendent testified that two sites were talked of to handle the timber on sections 11 and 12, either on 12 close to the Gates branch or in the center between 11 and 12.

"*Q.* What was said as to the mill sites on 23 and 24?
"*A.* It was to be put on 23, put in the center or a little on the west side of the section.
"*Q.* What was said about the mill site on 28 and 27?
"*A.* That was to be placed on what is called the big spring; there is water there, that is why.   *   *   *
"*Q.* Outside of this one mill site, where the mill is now at the present time, was there ever any mill site located, positively decided outside of this one mill site?
"*A.* There was other mill sites that we talked of as to where they would be located, where they put or agreed to put a mill in.   *   *   *
"*Q.* About the mill sites selected in those different bunches of timber was there any other place in that timber that was suitable for mill sites other than you selected?
"*A.* No, sir."

As to the amount of timber to be put in, plaintiff testified:

"*Q.* What, if anything, was said about the manner in which they desired it put in as to amount?
"*A.* They wanted 2,000,000 a year or more, not less than 2,000,000 a year, and more if they wanted it.
"*Q.* If they wanted more put in, you would have to put it in?
"*A.* Yes."

Defendants' superintendent testified:

"*Q.* What was said between Raupp and Herron as to the amount that was to be taken off, how long it was to take?
"*A.* He said the bark must be peeled first and then the timber must be cut, 2,000,000 or more, as much as they liked to have cut during the season."

Plaintiff entered upon the performance of the contract, but was prevented by defendants from completing it as to the logging of the timber. Plaintiff recovered a ver-

dict, and defendants seek a reversal on various assignments of error; the principal ones being that the court erred in refusing to give defendants' second and fourth requests to charge, and in charging the jury "that plaintiff could recover damages for the entire timber."

Defendants' second request was as follows:

"The evidence in this case conclusively shows that by the terms of the verbal contract the same was not to be performed in one year from the making thereof, and therefore the same is void, and your verdict must be for the defendants."

Plaintiff testified that defendants informed him that they had four years within which to take the timber off.

"*Q.* Was it possible for you to carry out that contract with your equipage during that season?

"*A.* I would have to if they put mills enough in to cut it all the way we talked.

"*Q.* Could you have managed to haul the logs to four different mills? Did you have the men up there to do it?

"*A.* We could get them in. * * *

"*Q.* And he wanted you to take the timber off within the four years?

"*A.* Well, he said 2,000,000, or more if they wanted it, a year.

"*Q.* Did you understand by that, that if they wanted the entire 8,000,000, or 6,000,000 in one year, you could furnish it?

"*A.* No; I didn't figure on that.

"*Q.* You figured on furnishing about 2,000,000 a season, or a little over, if they wanted it?

"*A.* Yes."

Plaintiff testified as to the bark, as follows:

"*Q.* Did he state how much tan bark he wanted each year?

"*A.* All I could take handy off 14.

"*Q.* Was it understood that your contract was to cover section 14 that year? Were you to work upon any other section that season?

"*A.* No; we didn't talk about that.

"*Q.* You didn't talk about whether you were to take any tan bark off any other section that season or not?

"*A.* No; I wasn't to take any more off any other place that year.

"*Q.* And you were to start upon the other sections the next season?

"*A.* Yes, sir; and keep on.

"*Q.* That was all the work you were to do that year was to be done on section 14?

"*A.* He did not say that year.

"*Q.* The season was to be done on section 14?

"*A.* Section 14.

"*Q.* And the next season you were to take up the next section? How was that to be arranged?

"*A.* Keep on, and wherever they would put the mill.

"*Q.* Was the mill to be changed that season or the next season?

"*A.* To be changed whenever they got through. They didn't know how soon—when they got that cut out. * * *

"*Q.* How many months were you actually engaged in peeling bark there?

"*A.* I went there pretty early that season. I think it was about two months.

"*Q.* How much of the bark did you peel?

"*A.* About 140 cords.

"*Q.* Did you have any arrangement about how long it was to take you to peel the bark?

"*A.* No.

"*Q.* Did you understand that you were to go on the next season and peel the bark?

"*A.* He didn't say that he wanted it peeled the next season.

"*Q.* Was there anything said about how much bark you were to peel?

"*A.* No, sir; only on 14. Peel what I could on 14 until the mill would start in.

"*Q.* You were not to peel any more bark that season, were you? After the mill started, what were you to do?

"*A.* I was to put logs into the mill and stock the mill. I let the job of peeling the bark.

"*Q.* And when were you to peel the bark next?

"*A.* We didn't say anything about that.

"*Q.* When the contract was made, didn't he say anything about it then?

"*A.* No. * * *

"*Q.* And it wasn't possible to finish peeling that bark that season?

"*A.* On 14.

"*Q.* On the other sections, is that right?

"*A.* Yes.

"*Q.* And that was according to the talk you had with Mr. Raupp at the time these negotiations were going on about this contract?

"*A.* There was nothing said about peeling bark another season."

Defendants had paid plaintiff in full for the bark peeled before the suit was started. It was open to the jury to find from the testimony that the contract as to the bark related to section 14 for the season of 1906, and that complete performance of the logging contract within one year might by its terms be demanded, and that such performance was possible. It follows that the court did not err in refusing the request. *Barton* v. *Gray*, 57 Mich. 622; *Smalley* v. *Mitchell*, 110 Mich. 650.

Defendants' fourth request was as follows:

"As the profits in this case which might have been made in the performance of the contract are conjectural, speculative, and dependent on chances, such as the location of mill sites, weather, and other conditions, there can be no recovery for them in this case."

In support of this request defendants' counsel argue in their brief:

" Plaintiff testified as regards profit:

" '*Q.* Wouldn't your profits depend on the location of those mill sites?

" '*A.* Yes.'

" He had also testified that defendants had agreed to have four mill sites, and that two of these had not yet been selected. As the profits of plaintiff would be dependent on the location of these mill sites, we submit there could be no recovery for them in this case under the rule laid down in *McKinnon* v. *McEwan*, 48 Mich. 106; *Allis* v. *McLain*, 48 Mich. 428; *Petrie* v. *Lane*, 67 Mich. 454."

Mr. Ash, an expert land looker and lumberman, testified that "the timber on the lands was in bunches. There was four bunches of the timber." He gave an

estimate of the timber in each bunch, and a description of the physical and topographical characteristics and conditions, with maps and plats:

"*Q.* Now, the timber on sections 11 and 12, 23 and 24, and 27 and 28, you have said that it would cost about $1.50 to cut and skid it. What would it cost to put it upon the skids at the mill?

"*A.* Well, about a dollar as a rule, some of it less. * * * On 14 the haul was so short it would not make any difference whether there was very much snow or not.

"*Q.* Then it would make a difference with the others?

"*A.* Yes; it would make a difference, but if you get a log loaded once you can draw it quite a piece for a dollar. That job could be lumbered at any time, and under any sort of conditions, and with very little added expense the timber could be trucked to the mill site, leaving out section 14 for that matter, for $1 a thousand. In my estimates I figured on an ordinary season."

In view of this testimony and the testimony of defendants' superintendent that the sites selected in the different bunches of timber were the only suitable mill sites, and that the failure to specifically locate all of the mill sites was due entirely to the defendants' failure to keep its agreement to locate them, we do not think that the court erred in refusing to grant this request. *Rayburn* v. *Comstock*, 80 Mich. 448; *Lee* v. *Briggs*, 99 Mich. 487; *Industrial Works* v. *Mitchell*, 114 Mich. 29.

In support of the assignment that the court erred in charging the jury "that plaintiff could recover damages for the entire timber," defendants' counsel contend:

"There was no evidence introduced by plaintiff showing a contract between him and defendants to log this entire tract of timber, and even under his own testimony the defendants could have discharged him at any time without entailing on themselves liability for breach of contract, and it was error for the court to charge the jury that plaintiff could recover damages for the entire timber."

We think there was sufficient evidence to the effect that the logging agreement covered the entire tract.

We have considered the other assignments, but think they are sufficiently covered by our previous discussion. The charge of the trial judge was eminently fair towards defendants, and was an able, clear, and correct presentation of the case to the jury.

The judgment is affirmed.

GRANT, MONTGOMERY, MOORE, and McALVAY, JJ., concurred.